**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDWARD TICHELI,**

        **Plaintiff,**

   **v.**                                        **1:14-CV-00172**

**TRAVELERS INSURANCE COMPANY,**

        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

**I.   INTRODUCTION**

Plaintiff Edward Ticheli brought this action against Defendant Travelers Insurance Company[1] asserting claims for Breach of Contract (Count I); Indemnification (Count II); and a Violation of New York General Business Law § 349 (Count III).  *See* Compl., dkt. # 1. Count III was previously dismissed.  See 12/13/14 Dec. & Ord., dkt. # 43.  The parties now cross-move for summary judgment. Dkt. # 24; dkt. # 40.  The Court has considered all of the submissions relative to these motions, and reaches its decision without the need for oral argument.

---

[1] Defendant asserts that its name is actually Travco Insurance Company.  However, in keeping with the allegations in the Complaint, the Court will refer to Defendant as "Travelers" or "Defendant" for purposes of this motion.

1

## II.  STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).  When considering cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir. 2002)(citation omitted).   "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993).

## III.  BACKGROUND[2]

In December 2005, Plaintiff purchased a home located at 11 Shaft Road, Gardiner, New York (the "Home") as a weekend and summer residence.  At the time he purchased it, the Home was being constructed.  (7/24/14 Premisler Dec., Ex. "G" (Plaintiff's Dep. Test.) [p. 21]).  Plaintiff did not engage an engineer or conduct any other professional inspection

---

[2]Unless indicated otherwise, the facts set forth above are taken from the parties' Local Rule 7.1(a)(3) Statements of Material Facts that are admitted by the opposing party, properly supported by the record, or deemed admitted for failing to provide proper factual opposition. See Local Rule 7.1(a)(3).

before purchasing the Home. (*Id.* [pp. 17-18]). Apparently unknown to Plaintiff at the time, the Home was built over, or in direct proximity to, an underground mine shaft. (*Id.* [p. 24] ("It's a road they call Shaft Road because it's on a mine shaft we found out."); *see id.* [p. 57] ("I have an appraisal of negative $40,000 for my home. It needs to be demoed [*sic*]. It should have never been built there.")).

After construction was finished, Plaintiff and his family stayed in the Home approximately two times a month until April 2009. In April 2009, Plaintiff became aware of the presence of methane gas in the Home's water supply, which he deemed a "problem." (Pl. Resp. to Def. State. Mat. Facts ("PRDSF"), ¶ 6; 7/24/14 Premisler Dec., Ex. "G" (Plaintiff's Dep. Test.) [pp. 22, 30-38, 72, 109]). In this regard, the water was "marshy and murky." (7/24/14 Premisler Dec., Ex. "G" [p. 30]). Plaintiff "detected a sulfurous, 'rotten egg' odor ..." and "immediately called the power company." (PRDSF ¶ 7). He testified that the power company inspector determined that the odor was caused by "methane gas entering the house through the water supply." (7/24/14 Premisler Dec., Ex. "G" [pp. 35, 72]). According to Plaintiff, the power company inspector – in April 2009 – advised him that the level of methane contamination was "bordering on explosive." (PRDSF ¶ 9). The inspector also told him that "I've been doing this 26 years. Five is explosive. Yours is four-something. You can set the faucets on fire. Six-inch flames would come out." (Pl. 12/16/14 Stat., ¶ 9; see also 7/24/14 Premisler Dec., Ex. "G" [pp. 30-31, 72, 109] and Ex. "F"). The inspector further told Plaintiff: "The reading that I took, I never had a reading that high on a residential dwelling. It was significant enough for us that we talked about it at the coffee table discussion for about a week." (7/24/14 Premisler Dec., Ex. "G" [p. 31]).

3

Plaintiff contacted Water Solutions, a licensed water company. The owner of Water Solutions inspected the Home and conducted a "burn test." He held a cigarette lighter to the water faucet to show that flammable methane gas was exiting, and to demonstrate the seriousness of the situation. (PRDSF ¶ 10). The owner of Water Solutions installed a water filtration system in the home. Plaintiff contends that he was assured by Water Solutions' owner that the water filtration system would alleviate the methane problem. However, after installation of the filtration system, Plaintiff continued to smell sulfur which, he believed, accompanied the methane gas. As a result, Plaintiff and his family significantly abated use of the Home, with Plaintiff estimating that he went to the Home "maybe five or six" times between April 2009 and February 2011. (7/24/14 Premisler Dec., Ex. "G" [pp. 22-25, 45]).

Plaintiff purchased from Travelers a High Value Homeowners Policy for the period of December 21, 2010 to December 21, 2011 ("the "Policy). The Policy was a standard-form policy with a "Dwelling" Limits of Liability of $504,000 insuring the Home.

In February 2011, while Plaintiff and his family were away, a fitting in the Water Solutions' water filtration system cracked, causing a flood of approximately 100,000 gallons of water in the Home's basement.[3] On February 16, 2011, Plaintiff filed a claim with Travelers for property damage caused by the flooding. In doing so, Plaintiff informed Travelers of the presence of methane gas in the water supply which, necessarily, included the water that flooded the Home's basement. In response, Paul Palliser, Travelers' Outside Claim Representative, wrote to Plaintiff on February 16, 2011 stating:

---

[3] A neighbor who checked on the Home informed Mr. Ticheli of the flood approximately two weeks after it occurred.

4

> This letter is being [sic] in regards to our 2/16/11 conversation. We ask that you please get the water filtration system as soon as possible in order to prevent a potential methane gas explosion in the home. Also, please do not discard the old filtration system. Our subrogation department may be contacted [sic] you so they can set up a time to inspect the filtration system to determine the cause of the failure and verify that [sic] is no longer working.

(Pl. Counter-Stat. Mat. Facts ("PCSMF") ¶ 7).

Travelers investigated in order to pursue costs from Water Solutions and/or its insurer in connection with the water damage claim. Travelers sent a number of representatives to inspect the Home for damage in February 2011. Its Forensic Specialist, David E. Beauregard, concluded, among other things, that the "origin of the water damage was a broken valve on a sediment trap component of a methane filtration system." Travelers' inspectors advised Plaintiff to install a new water filtration system.[4]

The real estate broker who sold Plaintiff the Home referred him to George Bliss of Pure Bliss Water Systems for the installation of a new water filtration system. (Ticheli Dep., p. 52; see id. p. 57 (Travelers was not involved with the selection of George Bliss)). Mr. Bliss inspected the Home, and like Water Solutions' owner, conducted a burn test that confirmed the presence of methane gas in the water supply. Mr. Bliss installed the new water filtration system around June 2011, and serviced the water filtration system every couple of months. Travelers reimbursed Plaintiff for the cost of installing this water filtration system.

Plaintiff's first visit to the Home after the installation of the second water filtration

---

[4]Although Plaintiff contends that Travelers representatives advised him to install a new water filtration system "to address the methane," the facts do not indicate that the Travelers investigators were concerned with the methane entering the house as opposed to determining the cause of the flood. Plaintiff testified that every time he asked Travelers investigators "What about the methane?", they simply "looked down" and never addressed his concerns. Ticheli Dep., p. 57.

5

system was in August or September 2011. Upon entering the Home, Plaintiff and his wife detected the sulfurous odor that accompanies the presence of methane gas. Further, the methane gas filtered by the water filtration system apparently found its way into Mr. Ticheli's daughter's bedroom. (PCSMF ¶ 16). Realizing that the second water filtration system was not eliminating the methane gas in the water supply, Plaintiff began to consider selling the Home. (Michael Dec., Ex. G at ¶ 19). He consulted a number of local real estate professionals all of whom opined that it was unlikely that he would be able to sell it due to the methane gas contamination. A later appraisal valued the Home at "minus $40,000," stating:

> The subject property, whatever its appearance or original qualities were, is uniquely flawed with an uncorrectable and potentially deadly problem. Irrespective of its building costs, its initial valuation or its original sale price, the overwhelming, toxic presence of methane gas on the site has [damaged the property and] rendered the property functionally unusable, completely unsalable and totally unsafe. . . . . Because there is no "comparable" category . . . establishing a fair and honest market value for such a property . . . it is not salable.

(PCSMF ¶ 18).

In November 2011, Plaintiff engaged an environmental inspection firm, ECC Horizon, to inspect the Home. PCSMF ¶ 20. ECC Horizon concluded in a report dated October 4, 2012 that "[b]ased on the detection of methane gas in the post-treatment water samples, the naturally occurring concentration of methane gas in the groundwater is not effectively removed by the existing methane gas treatment system *even at low water rates.*" (Michael Dec., Ex. L at 7 (emphasis in original)).[5]

---

[5]ECC Horizon also examined the amount of carbon monoxide (CO) and hydrogen sulfide ($H_2S$) that were present in the Home. It concluded that poisonous, dissolved hydrogen sulfide and carbon monoxide gases were present in the water supply. It stated that although the methane mitigation system was not designed to specifically remove hydrogen sulfide or carbon monoxide, the existing system appeared capable
(continued...)

6

On November 30, 2011, Plaintiff notified Travelers of an alleged methane gas contamination loss. (Def. Stat. Facts, ¶ 14). On December 5, 2011, Travelers requested a proof of loss, reserved its rights, and proceeded to investigate. (*Id.* ¶ 15). Plaintiff provided Travelers with a "Sworn Statement in Proof of Loss" dated January 5, 2012 and various documents (including a February 1, 2012 Certification), and appeared for an examination under oath. (PRDSF ¶ 16). Plaintiff's "Sworn Statement in Proof of Loss" indicates: "Damage by methane gas caused a total loss to property." (Premisler Dec. Ex. E, ¶ 1). The amount claimed for the loss is $509,000.00, which is the full amount of the Policy. (*Id.* ¶ 10).

Travelers began investigating the claim. Plaintiff points to portions of Traveler's investigators' internal emails which, to Plaintiff, indicate that the investigation was focused on finding a reason to disclaim coverage. This included an email from Ray Kennedy, an investigator in Travelers Special Investigation Unit, to Dean Piaquadio, Travelers' assigned claim handler. This email indicates that Kennedy would interview the insured; inspect the loss location and assist the claims personnel; and "attempt to find witnesses to disprove the insured's allegations." (PCSMF ¶ 25). Kennedy wrote in another email that Plaintiff's debts,

---

⁵(...continued)
of removing the hydrogen sulfide gas from the water supply, at least at low flow rates. It was not, however, able to remove the carbon monoxide gas. ECC Horizon concluded: "As a result, the residence's indoor air is at risk of CO accumulation when not actively ventilated." (Michael Dec., Ex. L at 7 ). Because carbon monoxide is potentially harmful or fatal and cannot be detected with human senses, ECC Horizon opined that unless "the existing groundwater treatment system is upgraded to address CO gas infiltration, a functioning CO detection system should be installed and maintained in an operational condition during occupancy." It also concluded: "Further testing is required to determine how effective the existing treatment system will be for removing methane and $H_2S$ during high and sustained water usage, and to quantify the amount of harmful gases (methane, $H_2S$ and CO) that bypassed the system. With the existing water treatment system, indoor air monitoring may be prudent or required during normal occupancy." (*Id.* 7-8).

It is unclear whether Plaintiff was aware of ECC Horizon's conclusions at the time he filed his claim with Travelers for the alleged loss due to methane gas contamination.

discovered during a background check, "certainly could serve as a motive." (*Id.* ¶ 26).

On December 24, 2012, Travelers disclaimed coverage because (1) Plaintiff had not given timely notice as required by the Policy; (2) the Policy contained a provision precluding coverage for pollution claims; (3) the alleged loss was not a "direct physical loss" and thus not covered by the Policy; and (4) the Policy's "siting" and "suit limitations" provisions precluded coverage.

In January 2013, Plaintiff and his wife commenced a tax certiorari proceeding against the Town of Gardiner. (Michael Decl., Ex. M). They presented a proposed stipulation asking the Town to, *inter alia*, withdraw the House's Certificate of Occupancy because extraordinary levels of methane gas contamination made it uninhabitable. Plaintiff and his wife agreed to no longer inhabit the House. The Town Board ratified the stipulation. (*Id.*).

Travelers reiterated its disclaimer on March 11, 2013. (PCSMF ¶28). This lawsuit followed.

## IV.   DISCUSSION

### a.   Timeliness of Notice

With respect to its first-party "property coverages," the Policy requires "prompt" notice.[6] Under a "prompt" notice requirement, an insured must provide such notice within a

---

[6]The Policy states:

Your Duties After Loss. In case of a loss to covered property, you must see that the following are done:

a.   Give prompt notice to us or our agent.

\* \* \* \*

d.   Protect the property from further damage. If repairs to the property are required, you
(continued...)

8

"reasonable" period of time under the circumstances. *Green Door Realty Corp. v. TIG Insurance Company*, 329 F.3d 282, 287 (2d Cir. 2003); *see Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 Fed. Appx. 52, 57 (2d Cir. 2011)(Under New York law, timely notice is notice given "within a reasonable time under the circumstances."). A failure to do so vitiates the policy and any coverage obligation, regardless of whether the insurer was prejudiced. *Briggs Ave. LLC v. Ins. Corp. of Hannover, 11 N.Y.3d 377, 381–82, 870 N.Y.S.2d 841, 899 N.E.2d 947 (2008); Heydt Contracting Corp. v. American Home Assurance Co.*, 146 A.D.2d 497, 498, 536 N.Y.S.2d 770 (1st Dep't 1989); *see also Travelers Ins. Co. v. Volmar Const. Co., Inc.*, 300 A.D.2d 40, 42 (1st Dep't 2002)("An insurer's obligation to cover its insured's loss is not triggered unless the insured gives timely notice of loss in accordance with the terms of the insurance contract. The notice provision in

---

[6](...continued)
    must:

        (1)    Make reasonable and necessary repairs to protect the property; and
        (2)    Keep an accurate record of repair expenses;

    e.    Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

    f.    As often as we reasonably require:

        (1)    Show the damaged property;
        (2)    Provide us with records and documents we request and permit us to make copies; and
        (3)    Submit to examination under oath, while not in the presence of any other "insured," and sign the same;

                * * * *

(PRDSF ¶ 2).

the policy is a condition precedent to coverage and, absent a valid excuse, the failure to satisfy the notice requirement vitiates the policy.")(internal citations and quotation marks omitted); *Power Authority v. Westinghouse Elec. Corp.*, 117 A.D.2d 336, 339 (1st Dep't 1986)("An insurer's obligation to cover its insured's loss is not triggered unless the insured gives timely notice of loss in accordance with the terms of the insurance contract.  Without timely notice, an insurer may be deprived of the opportunity to investigate a claim and is rendered vulnerable to fraud.  Late notification may also prevent the insurer from providing a sufficient reserve fund.  For these reasons, the right of an insurer to receive notice has been held to be so fundamental that the insurer need show no prejudice to be able to disclaim liability on this basis.")(interior citations and quotation marks omitted).

"The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Pfeffer v. Harleysville Group, Inc.*, 2011 WL 6132693 (E.D.N.Y. Sept. 30, 2011), *affirmed*, 502 Fed. Appx. 28 (2d Cir. 2012) (applying a similar notice provision to that at issue here); *see also Cambridge*, 421 Fed. Appx. at 56 (The "duty to give an insurer notice arises when, from the information available relative to the accident, an insured could glean a reasonable possibility of the policy's involvement.").  In other words, the "fact that a particular occurrence may not in the end result in a ripened claim does not relieve the insured from advising the carrier of that event . . . the mere possibility of a claim should have alerted plaintiff to the necessity of promptly informing its insurance carrier." *Heydt*, 146 A.D.2d at 499; *see also Pfeffer*, 2011 WL 6132693 at * 4 ("the policy's notice provision does not require Plaintiff to assess the extent of the damage.  Rather, when

10

there is a possibility of loss or damage, he is required to give prompt notice."); *Republic New York Corp. v. American Home Assur. Co.*, 125 A.D.2d 247, 248 (1st Dep't 1986) ("If [the insured] wanted to preserve its right to collect, it had to inform [the insurer] about the possibility of a claim as soon as practicable.").

When a policy unambiguously requires the insured to provide prompt notice of a loss, "[n]o exception is made for losses which appear insubstantial or which in the insured's estimation may not ultimately ripen into a claim….; all losses are to be reported as soon as practicable if they are to become the basis of a claim." *Power Authority*, 117 A.D.2d at 340. "[A]n insured may not avoid giving notice during the period that the exact amount of the loss is established or the details are clarified." *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118, n. 4 (1984); *see also Pfeffer*, 2011 WL 6132693 at * 4 ("the policy's notice provision does not require Plaintiff to assess the extent of the damage").

The claim in issue here is that methane gas infiltration through the water system prevents habitation in the House. (*See* Premisler Dec. Ex. E, ¶ 1 ("Damage by methane gas caused a total loss to property.")). There is no genuine dispute that Plaintiff became aware of the seriousness of the methane gas infiltration in April 2009. It was then that a power company inspector and Water Solutions' owner demonstrated the seriousness of the methane gas infiltration**.** Both told Plaintiff that flammable methane gas was coming out of his faucets; the power company inspector said it was the worst residential case he had seen in his 26 year career; Plaintiff was advised that the situation was "near explosive"; and Plaintiff recognized it as a "problem." The circumstances known to Plaintiff in April 2009 would have suggested to a reasonable person the possibility of a claim.

Plaintiff's initial attempt to ameliorate the problem through the installation of a water filtration system, when viewed in the light most favorable to Plaintiff, could be construed as an excuse or reason for any delay in providing notice. However, the facts also indicate that even after installation of the filtration system, Plaintiff continued to smell sulfur which, he believed, accompanied the methane gas. As a result, Plaintiff and his family significantly abated use of the Home, with Plaintiff estimating that he went to the Home "maybe five or six" times between April 2009 in February 2011 because of the presence of methane. Moreover, Plaintiff presents no evidence indicating that methane gas contamination was any worse in 2011 than it was in 2009. In fact, he testified that the contamination remained constant, and that he determined to submit his claim because he learned that the Home was inalienable due to the methane gas contamination - not because the House became any more uninhabitable than it was in 2009. (*See e.g.*, 7/24/14 Premisler Dec., Ex. "G" [pp. 53, 64][7]).

---

[7]Plaintiff was asked these questions and gave these answers at his deposition:

Q:   Did Bliss common inspect the property?

A:   Yes. They did a burn test and it burned.

Q:   Any different from when Water Solutions did the burn test; any better, worse, any difference?

A:   I think it was the same deal.

Q:   Other than the burn test, did they take any readings?

* * *

A:   Not to my knowledge. I think once they ignited it, that's all they needed to know, that methane is coming into your home I think.

Ticheli Dep. p. 53.

(continued...)

12

"The insured bears the burden of showing any delay was reasonable under the circumstances." *Travelers Indem. Co. v. Northrop Grumman Corp.*, 3 F. Supp.3d 79, 103 (S.D.N.Y. 2014)(citing *Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.*, 31 N.Y.2d 436, 441 (1972)). "A delay may be found unreasonable as a matter of law when . . . the proffered excuse is meritless." *Id.* at 104 (citing *Olin Corp. v. Insurance Co. of North America*, 966 F.2d 718, 724 (2d Cir. 1992)). Plaintiff has not met his burden of showing that a delay beyond April 2009 was reasonable under the circumstances.

Based on the undisputed facts, a reasonable fact finder could only conclude that it was "possible" that a claim existed because of the infiltration of noxious and dangerous methane gas in April 2009. Plaintiff's delay in making a claim after April 2009 can only be seen as an attempt to assess the situation to see if it ripened into a claim, or to assess the extent of the damage. This is insufficient. As indicated above, the notice provision requirement is triggered when the circumstances are such that one could glean a reasonable possibility of the Policy's involvement. Assuming, arguendo, that the Policy insured against pervasive methane infiltration into the Home, the Policy's notice

---

[7](...continued)
- Q: Was there any new physical damage to the property that prompted you to submit the claim?
- A. No.
- Q: Did anything change with the methane from the time that George Bliss installed the new filtration system?
- A: The methane was now officially documented and would be on a contract of sale.
- Q: That is what changed?
- A: Correct. And the opinions I got from real estate professionals, they're telling me the house is unsellable [*sic*], and I have liability if I do sell the house.

Ticheli Dep. p. 64.

13

requirement was triggered in April 2009.

Plaintiff notified Travelers of an alleged methane gas contamination loss on November 30, 2011, approximately 2 ½ years after the notice requirement was triggered. Plaintiff argues that he notified Travelers of the methane gas contamination on February 16, 2011 when he filed a claim related to the flooding in his basement. However, the undisputed facts indicate that the February 16, 2011 claim concerned only property damage caused by the flooding in the basement. Any reference to methane gas was tangentially related to the water filtration system that had malfunctioned and caused the property damage in the basement. Although a Travelers representative warned Plaintiff to reinstall a filtration system to prevent the dangers of methane gas infiltration, there is no evidence indicating that Plaintiff put Travelers on notice that the methane infiltration made the House uninhabitable.

Further, assuming arguendo that Plaintiff did make the subject-claim on February 16, 2011 (that is, that he claimed the House was uninhabitable because of the presence of methane gas), three attendant issues arise - all of which cut against Plaintiff's position. First, there are no events or circumstances between April 2009 and February 16, 2011 that would cause a reasonably objective observer to conclude that the House was more uninhabitable after April 2009. All that can be gleaned from the facts is that between April 2009 and February 16, 2011, the newly installed water filtration system failed to prevent the infiltration of methane gas (as smelled by Plaintiff and which caused Plaintiff and his family to abate regular trips to the House after April 2009), and the water filtration system malfunction causing flooding in the basement (a fact that did not make the House any more uninhabitable due to the presence of methane gas then existed before the flooding). Simply

14

stated, the argument that the methane gas claim was presented to Travelers on February 16, 2011 only serves to cement the trigger date of the claim as April 2009. Second, the delay between April 2009 and February 16, 2011 is not excused because, for the reasons just discussed, there existed no intervening facts or circumstances justifying the delay. And third, for the reasons discussed next, the delay of one year, and 9 ½ months is excessive under a prompt notice requirement.

"When an insurance policy requires immediate notice of a claim, courts have held even short delays to be unreasonable." *Northrop Grumman Corp.*, 3 F. Supp.3d at 103. "Some courts have held delays of fewer than 54 days to be untimely as a matter of law." *Id.* (citing *Am. Home Assur. Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993) (collecting eight cases in which delays of fewer than 54 days had been held untimely as a matter of law)); *see Tower Ins. Co. of New York v. Miles*, 74 A.D.3d 410, 410 (1st Dep't 2010)("Because defendants were knowledgeable of facts that suggested a reasonable possibility of a claim against them and failed to conduct a sufficient inquiry into the circumstances, their five-month delay in notifying plaintiff of the incident was unreasonable as a matter of law."); *American Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 440 (2d Cir. 1995) ("delays for one or two months are routinely held 'unreasonable.'"); *Horowitz v. Transamerica Ins. Co.*, 257 A.D.2d 560, 683 N.Y.S.2d 290 (2d Dep't 1999) (48 days); *Goodwin Bowler Assocs., Ltd. v. Eastern Mut. Ins. Co.*, 259 A.D.2d 381, 687 N.Y.S.2d 126 (1st Dep't 1999) (two months); *Myers v. Cigna Property and Cas. Ins. Co.*, 953 F. Supp. 551 (1997) (two months); *Pandora Indus., Inc. v. St. Paul Surplus Lines Ins. Co.*, 188 A.D.2d 277 (1st Dep't 1992) (31 days); *Heydt, supra*, (four months); *Republic N.Y. Corp. v.*

15

*American Home Assur. Co.*, 125 A.D.2d 247, 248, 509 N.Y.S.2d 339, 339-40 (1st Dep't 1986) (45 days).

Here, the Policy required prompt notice. The notice of claim - whether provided on February 16, 2011 or November 30, 2011 - was untimely. Thus, Travelers properly denied coverage on this basis. Travelers' motion for summary judgment on this ground is granted.

### b.    Known Loss Doctrine

Defendant also asserts that Plaintiff's claim is barred by the "known loss doctrine," "a New York public policy that holds that 'an insured may not obtain insurance to cover a loss that is known before the policy takes effect.'" *84 Albany Ave. Realty Corp. v. Standard Fire Ins. Co.*, 13 F. Supp.3d 241, 245 (E.D.N.Y. 2014)(quoting *National Union Fire Ins. Co. of Pittsburgh, Pa. v. The Stroh Cos., Inc.*, 265 F.3d 97, 106 (2d Cir. 2001)). "The application of this doctrine requires 'consideration of whether, at the time the insured bought the policy (or the policy incepted), the loss, as opposed to the [mere] risk of loss, was known.'" *Id.* at 246 (quoting *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 29 Misc.3d 1201(A), 958 N.Y.S.2d 311 (Sup. Ct.2010)). "'This limitation to the doctrine obtains because knowledge of a risk is the very purpose of acquiring insurance.'" *Id. (quoting Union Carbide*, 958 N.Y.S.2d 311).

Here, the alleged loss is the pervasive infiltration of methane gas that renders the House uninhabitable. Assuming, arguendo, that this is a covered occurrence under the Policy, there are no facts which demonstrate that the nature and extent of such infiltration increased beyond that recognized in April 2009. The only event that occurred between April 2009 and the date that the Policy incepted (December 21, 2010) that could reasonably be

16

credited as a factor differentiating the "risk" of methane gas infiltration from the "loss" caused thereby was the installation of the first water filtration system. However, as described above, the installation of this water filtration system immediately proved ineffective in preventing the entry of methane gas. Indeed, Plaintiff and his family significantly abated their stays at the House since April 2009 because of the continued presence of this noxious gas. It was at this point that it became clear that the pervasive infiltration of methane gas into the House was more than simply a risk to the continued inhabitation of the House. Further, as indicated above, there are no facts or circumstances indicating that the nature and extent of the methane gas infiltration increased after April 2009, but rather only that Plaintiff determined that he would no longer put up with the situation. (*See e.g.*, Michael Dec., Ex. G at ¶ 19 (Realizing that the second water filtration system was not eliminating the methane gas in the water supply, Plaintiff began to consider selling the Home.) ; 7/24/14 Premisler Dec., Ex. "G" [pp. 63-65] (Plaintiff testified that he was prompted to put in the claim because he tried to sell the house but could not because of the documented methane gas infiltration.).

Thus, if there is a covered loss caused by the pervasive infiltration of methane gas into the Home, that loss was known to Plaintiff in April 2009, which was before the Policy incepted. Plaintiff's claim is barred by the Known Loss Doctrine. Accordingly, Defendant's motion is granted on this alternative ground.

### c.     Defendant's Remaining Grounds

Because the Court has already determined that Plaintiff's claim against the Policy is barred and that summary judgment must be granted to Defendant, there is no basis for the

17

Court to examine Defendant's other alternative grounds for summary judgment.

### d. Plaintiff's Cross-Motion for Summary Judgment

Likewise, because the Court has determined to grant summary judgment to Defendant, Plaintiff's cross-motion for summary judgment is denied as moot.

### V. CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [Dkt. # 24] is **GRANTED**, and the Complaint is **DISMISSED**. Plaintiff's cross-motion for summary judgment [dkt. # 40] is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated: March 14, 2015

_____
Thomas J. McAvoy
Senior, U.S. District Judge